IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

V.     NO. 3:19-CR-99

ANTHONY ROBINSON

**ORDER**

On December 18, 2019, during the trial of this case, the Court granted in part and denied in part Anthony Robinson's oral motion for a judgment of acquittal. This order memorializes and further explains that ruling.

**I
Procedural History**

On July 24, 2019, Anthony Robinson was named in an indictment charging four counts of cyber stalking. Doc. #1. Each count alleged that Robinson engaged in a course of conduct that placed a person "in reasonable fear of death and serious bodily injury and caused, attempted to cause and would be reasonably expected to cause substantial emotional distress to [the person], all in violation of Title 18, United States Code, Section 2261A(2)(A)." *Id*. at 5–7. Approximately one month later, Robinson was charged in a superseding indictment which, in addition to the four counts of cyber stalking, charged one count of unlawful possession of a firearm, and one count of unlawful possession of ammunition. Doc. #19.

The superseding indictment did not alter the language of the cyber stalking counts as set forth in the original indictment. *See id*. at 5–7. Specifically, the superseding indictment charged (1) in Count One, cyber stalking of Natalie Rector; (2) in Count Two, cyber stalking of Tim Newton; (3) in Count Three, cyber stalking of Marcia McShane; (4) in Count Four, cyber stalking of Lyshon James; (5) in Count Five, unlawful possession of an Eastern Arms Co. 16-gauge

shotgun, a Browning 12-gauge shotgun, a Marlin .22 caliber rifle, a Smith & Wesson .357 magnum revolver, and a Beretta .25 caliber pistol; and (6) in Count Six, unlawful possession of 16-gauge Federal #6 shotgun shells and 16-gauge Remington #6 shotgun shells. *Id*. at 5–8. The first morning of trial, before the commencement of jury selection, Count Two was dismissed on the government's motion.

During trial, at the close of the government's evidence, Robinson orally moved for a judgment of acquittal on all remaining counts. The Court denied the motion as to the cyber stalking counts and granted it as to Count Six. The Court found Count Five to be duplicitous and, therefore, properly separated into two separate counts—one count charging possession of the 16-gauge shotgun, which the Court referred to as Count Five, and one count charging possession of the four remaining firearms, which the Court referred to as "Count Seven." The Court then granted the motion as to the four firearms but denied it as to the 16-gauge shotgun.

Robinson then presented his case. After the close of all evidence, the case was submitted to the jury on the counts then remaining. The jury acquitted Robinson on Count One and Count Three but convicted him on Count Four and Count Five.

## II
## Standard

Federal Rule of Criminal Procedure 29(a) provides that "[a]fter the government closes its evidence … the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." In deciding a motion brought under Rule 29, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Daniels*, 930 F.3d 393, 402 (5th Cir. 2019).

2

**III**
**Evidence at Close of Government's Case-in-Chief**

In early 2018, Anthony Robinson was employed by Wise Staffing, a temp agency, and assigned to work at a Ryder facility in McCormick, Mississippi. Sometime between April and June, Robinson met Lyshon James, a human resources specialist with Ryder, who was based in Ryder's facility in Byhalia, Mississippi. Sometime later, Robinson dropped off a large stack of documents with James.[1] The documents, which were approximately one hundred pages, contained numerous references to mass shooters and shooting, including those at San Bernardino, Columbine, Virginia Tech, and Sandy Hook, and stated that the next shooter was right around the corner. James immediately sent the documents to numerous Ryder employees, including Natalie Rector, her supervisor.

Robinson's assignment with Ryder ended in early June. On or about June 11, 2018, Robinson submitted to Ryder a complaint for discrimination premised on numerous types of discrimination and "retaliation" for having given the documents to James. Rector conducted an investigation of the claim and determined no discrimination or retaliation occurred. Rector informed Robinson of the results of her investigation on October 12, 2018.

Almost immediately, Rector began receiving e-mails from Robinson which, in addition to referring to the alleged discrimination, referenced acts of rape, murder, and other types of violence. Contemporaneously, Robinson filed a civil action in the United States District Court for the Northern District of Mississippi against Ryder and numerous individuals, including James, who he attempted to serve personally at her office. To defend the lawsuit, Ryder retained the law firm of Constangy Brooks Smith & Prophete LLP, specifically, two Constangy partners—Marcia

---

[1] James testified that she believed the event occurred on June 18, 2018. However, the sequence of events discussed below makes this impossible.

McShane and Timothy Newton.

During the civil litigation, Robinson sent dozens of e-mails to Rector and nine e-mails to McShane. Robinson also sent eight e-mails to a scheduling address at the Byhalia facility. These e-mails were forwarded to James because she was the HR person over the relevant location. The e-mails ordinarily were forwards of e-mails from Robinson to various news organizations, most often *The Washington Post*. The e-mails were long and rambling and often referenced Robinson's perceived grievances with Ryder and James. Many of the e-mails contained discussions of perpetrators of violent crimes—including mass shootings, murder, and rape—often distinguished in some way from Robinson himself. Other e-mails spoke of Robinson's previous incarceration and his having found religion. None of the e-mails contained a direct threat of violence. Robinson also sent letters to the presiding magistrate judge in his civil case.

On April 23, 2019, in response to a motion for default judgment filed by Robinson in the civil case, Ryder, in a memorandum authored by McShane, asked "the Court [to] issue an order prohibiting Plaintiff from sending harassing and/or threatening communications, and requiring that all communications about any claims he is asserting against Ryder be sent directly to counsel for Ryder." Gov't Ex. 13. This request was never ruled on.

In June of 2019, United States Deputy Marshal Korey Reichert was assigned to conduct a threat assessment of the correspondence Robinson sent to the court. Based on the April 23 filing, Reichert reached out to McShane, who had her legal assistant send Reichert some of the e-mails she had received. Reichert observed McShane to be "extremely concerned" for her safety and the safety of others. Reichert then interviewed James and Rector, both of whom expressed the "same … fear." Reichert found that James in particular felt "singled out" by Robinson's conduct.

On June 27, 2019, James, due to Robinson's ongoing conduct, resigned from Ryder. In

4

her resignation letter, James stated, "I have been stressed and not able to sleep so I feel that by removing myself from the situation it will help me to get through it." Gov't Ex. 27. James, who had become nervous walking to and from her car, also purchased multiple cameras for her home as a security measure. Based on Robinson's references to violent crimes, McShane and Rector testified they were similarly afraid.

Ultimately, on July 10, 2019, Reichert asked United States Deputy Marshal Delvario Smith to speak with Robinson. Smith traveled to Robinson's mother's home, where Robinson resided, to discuss the e-mails Robinson had been sending. Robinson and Smith spoke for approximately forty-five minutes. The conversation, which was friendly in demeanor, touched on many subjects, including Robinson's garden and his belief that he had been falsely arrested in the past. On the subject of the e-mails, Smith never told Robinson to stop sending the e-mails but told Robinson that some of the e-mails he had been sending could be perceived as threats. Robinson responded that he did not intend to threaten anyone and that it was just "legal talk."

On July 18, 2019, Robinson's civil case was dismissed. Reichert was concerned about how Robinson would respond to the dismissal of his lawsuit and obtained an arrest warrant for Robinson and a search warrant for Robinson's mother's home. The warrants were executed on July 26, 2019. During the search of the residence, agents recovered the ammunition and five firearms listed in the superseding indictment. The 16-gauge shotgun ("Hallway Firearm") was found resting on nails in the wall above a doorway in a hall near Robinson's bedroom. The remaining firearms ("Cabinet Firearms") and the ammunition were located in separate sections of a metal cabinet located in the laundry room. The section of the cabinet containing the Cabinet Firearms was secured with a metal lock. The section of the cabinet containing the ammunition was unsecured.

# IV
# Analysis

Robinson's motion sought a judgment of acquittal on Counts One, Three, and Four (the remaining cyber stalking counts); Count Five; and Count Six.

## A. Cyber Stalking Counts

The remaining cyber stalking counts each charged one violation of 18 U.S.C. § 2261A(2)(A). Count One charged cyber stalking of Rector. Count Three charged cyber stalking of McShane. Count Four charged cyber stalking of James.

Ordinarily, to support a conviction under § 2261A(2)(A), the government must show (1) that the defendant used a facility of interstate commerce; (2) with malicious intent toward a person; (3) to engage in a course of conduct which placed the person in reasonable fear of the death or serious bodily injury to a person. As charged in the superseding indictment, the government was required to show that Robinson, with the intent to harass or intimidate Rector, McShane, and James, used a facility of interstate commerce to engage in a course of conduct which placed them each in reasonable fear of death or serious bodily injury to a person.

### 1. Facility of interstate commerce and course of conduct

To the extent the government's evidence showed that Robinson sent numerous e-mails to each person, a rational juror could easily find that he utilized a facility of interstate commerce with respect to each count, *see United States v. Kaye*, 451 F.Supp.2d 775, 782 (E.D. Va. 2006) ("A transmission of communication by means of the … Internet constitutes the use of a facility of interstate commerce."), and that he engaged in a course of conduct.

### 2. Intent

Under § 2261A, "intent may be inferred from the totality of circumstances surrounding the commission of the prohibited act," in this case, the sending of the e-mails. *United States v. Al-*

*Zubaidy*, 283 F.3d 804, 809 (6th Cir. 2002). This inquiry focuses on the frequency and content of the relevant messages. *United States v. Shepard*, No. 10-1032, 2012 WL 1580609, at *3 (D. Ariz. May 4, 2012).

Between October 2018 and July 2019 Robinson sent dozens of e-mails to Rector. These e-mails, as explained above, often referenced both Robinson's employment grievance and various violent crimes.[2] The frequency and the nature of these types of e-mails would easily allow a rational juror to infer an intent to intimidate or harass Rector.

While Robinson sent fewer e-mails to McShane and to James' facility,[3] the e-mails occurred over shorter periods—between March 28, 2019,[4] and July 8, 2019,[5] for James; and between April 2, 2019,[6] and June 17, 2019, for McShane.[7] Additionally, some of the e-mails, as with Rector, contained what may best be described as implicit threats.[8] Furthermore, based on the

---

[2] For example, in an April 17, 2019, e-mail Robinson sent to Rector, Robinson criticized Ryder's employment practices and then stated, "Everyone is not going to write, [sic] email letters and pray about the evil works done to them and the deception that go [sic] on behind closed doors like I do. Very few will but many will kill in a heartbeat. Turn on the news." Gov't Ex. 11a. The e-mail then stated, "Vigilante criminal justice is the end result for many who don't know how to read and write and fight for their rights. Thank God I do." *Id.* Four days later, on April 21, 2019, Robinson sent another e-mail to Ryder which, in addition to referring to his previous time in jail, stated, "There are people who have actually killed their own mother. Once the devil get [sic] your mind there is no telling whay [sic] you might do." Gov't Ex. 12.

[3] As mentioned above, the e-mails were not sent directly to James but to a scheduling e-mail address at the facility where she worked. Given the e-mails' references to employment grievances (and sometimes to James specifically) and that the e-mail address was at the facility where James had oversight, a rational juror could find the e-mails were intended to reach James in some fashion.

[4] Gov't Ex. 7.

[5] Gov't Exs. 18a, 18b.

[6] Gov't Ex. 8.

[7] Gov't Ex. 16b.

[8] For example, Robinson sent McShane the April 17 e-mail described above. On June 17, 2019, Robinson sent McShane an e-mail stating that people like DeWayne Craddock (the person responsible for the mass shooting in Virginia Beach) "go to such extreme measures" out of frustration and that he (Robinson) has been "dealing with that frustration [his] adult life." Gov't Ex. 16b. The e-mail further stated that Robinson was "thankful" he had not "resort[ed] to getting even, proving a point by killing twelve coworkers just because I was treated unfairly at my place of employment." *Id.* Similarly, on April 23, 2019, Robinson sent to the Byhalia scheduling address the April 21 e-mail described above.

involvement of the e-mails in the litigation at issue, a rational juror could infer that the e-mails, which referenced the litigation dispute and sometimes James specifically, were intended to be seen by both McShane (Ryder's lawyer) and James (one of the parties in the litigation). *See United States v. Hile*, 626 F. App'x 674, 678 (9th Cir. 2015) ("The statute only requires the conduct place the victims in reasonable fear of death/serious bodily injury or cause substantial emotional distress—it does not necessarily require direct contact with the victims."). For these reasons, a rational juror could find that Robinson also intended to harass or intimidate McShane and James.

### 3. Reasonable fear of serious bodily injury and death

For the purpose of § 2261A, "serious bodily injury" has the definition used in 18 U.S.C. § 2119(2), which takes its definition from 18 U.S.C. § 1365. Section 1365, in turn, defines "serious bodily injury" as a bodily injury which involves either "a substantial risk of death; extreme physical pain; protracted and obvious disfigurement; or protracted loss or impairment of the function of a bodily member, organ, or mental faculty." 18 U.S.C. § 1365 (paragraph lettering omitted).

Rector testified at trial that, based on the e-mails, she was afraid Robinson or "someone that he knew" would come kill or injure her. James, who resigned from her position out of fear of Robinson and purchased security measures for her home, testified that she was afraid of sitting in front of windows at her office and that Robinson may attempt to break into her room. McShane testified that the e-mails were "very concerning" and that she thought Robinson intended to perform the violent acts he referenced. McShane also testified that she showed Robinson's picture to her husband out of concern for how Robinson would react following the dismissal of his civil suit. Under these circumstances, a rational juror could find that each woman feared serious bodily injury or death.

As to reasonableness, it is true that Robinson never directly threatened any of the women or their families and in many instances distinguished himself from the perpetrators by his willingness to seek relief in the courts. However, these statements in themselves carried an implicit threat of what Robinson would do if the courts refused to grant him relief.

It is also true that McShane and Rector (who lived in Memphis and New York, respectively) did not live in the same state as Robinson. However, given the relative ease of interstate travel, the Court declines to hold as a matter of law that a rational juror could not find fear reasonable based on geographic distance alone. Thus, under these circumstances, the Court concludes that a rational juror could find James, McShane, and Rector to have reasonably feared death or serious bodily injury. Therefore, acquittal on the cyber stalking counts was inappropriate.

### B. Count Five

As mentioned above, Count Five charged a single violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2) based on the five firearms found in Robinson's mother's home. The Court, finding Count Five duplicitous because the 16-gauge shotgun was found in a different location than the other firearms, separated the count into two separate charges, and dismissed the charge to the extent it charged possession of the four firearms located in the locked cabinet.

The Court misspoke when it referred to duplicity. The duplicitousness of a count is not to be determined by reference to evidence at trial. *United States v. Mauskar*, 557 F.3d 219, 225 (5th Cir. 2009). Rather, when trial evidence reveals that a single count charges separate offenses, the count is said to violate the rule of unanimity rather than duplicity. *United States v. Correa-Ventura*, 6 F.3d 1070, 1081 (5th Cir. 1993). While the doctrines are invoked at different times, "the concern under either [unanimity or duplicity] is the same—the jury should not be permitted to evaluate separate and distinct offenses about which they may disagree in rendering a patchwork

guilty verdict." *Id*. at 1081. To this end, "a specific unanimity instruction may be required where two separate 'offenses' are included in the same count." *Id*. Such instruction informs the jury that to support conviction under the combined count, there must be unanimity as to at least one of the charges. *See id*.

Where, however, one of the offenses charged in a single count is unsupported by sufficient evidence, a unanimity instruction allowing for conviction under either offense (even the insufficient one) would necessarily be improper. *See United States v. Delgado*, 672 F.3d 320, 331 (5th Cir. 2012) ("[D]ue process requires the government to present evidence sufficient to prove each element of a criminal offense beyond a reasonable doubt."). It stands to reason, therefore, that the proper course is acquittal as to the unsupported charge. *See generally United States v. Garcia*, 27 F.3d 1009, 1016 (5th Cir. 1994) (district court properly granted partial acquittal on one offense contained in multi-offense count). To the extent Count Five charged separate offenses, the offenses must be evaluated separately under Rule 29.

**1. Separate offenses**

Under 18 U.S.C. § 922, simultaneous possession of multiple guns or multiple ammunition is a single unit of prosecution so long as the items were not obtained at different times or stored in different locations. *United States v. Berry*, 977 F.2d 915, 919–20 (5th Cir. 1992). Accordingly, simultaneous possession is improper when separate reception or possession is "charged or proven …." *United States v. Meza*, 701 F.3d 411, 433 n.9 (5th Cir. 2012). Where there is no evidence of simultaneous possession, multiple offenses are necessarily charged. *See United States v. Steiner*, 847 F.3d 103, 116–17 (3d Cir. 2017) (considering duplicity challenge premised on lack of evidence of simultaneous possession but ultimately finding simultaneous possession).

"Like 'simultaneous possession,' 'same location' is an imprecise concept, one whose

contours acquire definition by reference to case law." *United States v. Kennedy*, 682 F.3d 244, 256 (3d Cir. 2012). The Fifth Circuit has found simultaneous possession of a firearm and ammunition where a gun was found in a shed and ammunition was found in a closet in the home on the same property, *Meza*, 701 F.3d at 433; and simultaneous possession of firearms and ammunition found in a defendant's home, car, and person, *Berry*, 977 F.2d 917, 919–20. It has also found, in applying § 922's predecessor statute, that firearms were not stored separately when some were stored in an outbuilding and some were found in the bedroom of the defendant's trailer on the same property. *United States v. McCrary*, 643 F.2d 323, 327 (5th Cir. 1981). In reaching this conclusion, the panel noted that the "[t]he outbuilding constituted an integral part of the dwelling unit" because "[i]t was constructed upon the same residential lot and was used for ordinary household purposes, i. e., as a storage and laundry room." *Id*. at 328.

Notably, *McCrary* did not hold that all firearms found at a single address are necessarily simultaneously possessed. Indeed, such a holding would "collide[] with myriad decisions of Courts of Appeals … that understand the concept of simultaneous possession in the same location more narrowly." *Kennedy*, 682 F.3d at 256. Rather, when simultaneous possession is premised solely on a seizure at a defendant's home, a court must inquire whether the locations "constituted an integral part of the dwelling unit." *McCrary*, 643 F.2d at 328. In cases of joint occupancy, the inquiry must be limited to the defendant's dwelling unit. *See generally Meza*, 701 F.3d at 419 (constructive possession in jointly occupied dwellings depends on knowledge and access of defendant).

Here, as described above, the firearms at issue were found in two places in the home—above a door in the hall outside Robinson's bedroom, and in a locked cabinet in the laundry room. Applying the *McCrary* standard, the Court has no trouble concluding that both a hallway and a

11

laundry room represent integral parts of a dwelling unit. However, the Cabinet Firearms were not *just* found in the laundry room. They were found in a locked cabinet to which only Robinson's mother had the key. The cabinet, therefore, cannot be considered an integral part of Robinson's dwelling and, therefore, a finding of simultaneous possession which would justify a single charge is inappropriate. Accordingly, Count Five charged two separate offenses, unlawful possession of the Hallway Firearm and unlawful possession of the Cabinet Firearms.

### 2. Hallway Firearm

For years, the law was clear that to sustain a conviction under § 922(g)(1), the government must prove beyond a reasonable doubt "(1) that the defendant previously had been convicted of a felony; (2) that he knowingly possessed a firearm; and (3) that the firearm traveled in or affected interstate commerce." *Meza*, 701 F.3d at 418. However, earlier this year, the United States Supreme Court, in *Rehaif v. United States*, held "that in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." 139 S. Ct. 2191, 2200 (2019). In the wake of *Rehaif*, under the first element, the government must establish that a defendant "knew of his status as a convicted felon." *United States v. Johnson*, 781 F. App'x 370, 371 (5th Cir. 2019).

Here, the parties stipulated to the first and third elements. Docs. #41, #42. Accordingly, the only question was whether a rational juror could find that Robinson possessed the Hallway Firearm. "Possession of a firearm may be actual or constructive, and it may be proved by circumstantial evidence." *Meza*, 701 F.3d at 419. Both parties in this case agree that only constructive possession is at issue. In cases of joint occupancy, like the situation here, constructive possession may be "only when there is some evidence supporting at least a plausible inference that

12

the defendant had knowledge of and access to the illegal item." *Id.* (cleaned up).

While Robinson advanced a cursory argument to the contrary, there can be no serious dispute that the evidence supports a plausible inference that he both knew of the Hallway Firearm (which was hanging mere feet from his bedroom door), or that he had access to it. *See United States v. Tate*, 104 F. App'x 411, 413 (5th Cir. 2004) ("The presence of a firearm in plain view may indicate the requisite knowledge and access for constructive possession."). Accordingly, acquittal as to the Hallway Firearm was unwarranted.

### 3. Cabinet Firearms

Like the Hallway Firearm, the parties stipulated to the first and third elements of the crime of unlawful possession of the Cabinet Firearms. However, unlike the Hallway Firearm, the government failed to establish possession of the Cabinet Firearms.

Where, as here, items are located in a locked location, access may be shown by evidence that the defendant had a key, *United States v. Starks*, 145 F. App'x 939, 940 (5th Cir. 2005); that the lock could have been "easily opened" with items in the general vicinity, *United States v. Rivers*, 355 F. App'x 163, 166 (10th Cir. 2009); or other evidence showing access, such as the defendant's fingerprints on items in the locked area, *United States v. Hamilton*, 722 F. App'x 359, 360 (5th Cir. 2018).

In this case, the government wholly failed to introduce any evidence which would support a plausible inference that Robinson had access to the Cabinet Firearms. There was no evidence Robinson had a key to the cabinet or that Robinson's fingerprints were on anything in the cabinet (or even the cabinet itself). And there was no evidence which would show that Robinson knew the key was in his mother's purse, that he had access to the purse, or that he otherwise had the ability to access the contents of the locked cabinet. Courts have found no constructive possession


under similar circumstances. *See United States v. Wilson*, 619 F.3d 787, 797 (8th Cir. 2010) ("The car was locked and there was no evidence suggesting Wilson had a key or otherwise had access to the inside of the vehicle. Nor was there any evidence suggesting that Wilson could have opened the safe in the car, where most of the cocaine was found, had he been able to gain access to the inside of the vehicle.") (citation omitted). Because the government failed to introduce any evidence which would support a finding of Robinson's constructive possession of the Cabinet Firearms, acquittal as to that charge was warranted.[9]

### C. Count Six

Count Six charged the unlawful possession of certain 16-gauge ammunition. Prior to *Rehaif*, the elements of this offense were "that the defendant was previously convicted of a felony, that he knowingly possessed ammunition, and that this ammunition traveled in or affected interstate commerce." *United States v. Hinojosa*, 349 F.3d 200, 203 (5th Cir. 2003). While it appears the Fifth Circuit has not yet addressed the issue, it is clear *Rehaif* applies to the foregoing elements such that the government must show the defendant knew he was a felon. *United States v. Benamor*, 937 F.3d 1182, 1186 (9th Cir. 2019). As with Count Five, the parties stipulated that Robinson knew he was a felon and that the relevant ammunition traveled in interstate commerce. The only issue, therefore, was possession which, as explained above, depends on a showing that the defendant had knowledge of, and access to, the ammunition. Because the ammunition was unsecured, the Court need only consider Robinson's knowledge of the ammunition. *See United States v. Webster*, 400 F. App'x 666, 668 (3d Cir. 2010) (defendant had access to unlocked hallway

---

[9] Although not strictly a Rule 29 mechanism, a court may, at the close of the government's case, strike any allegations in the indictment which are unproven. *See United States v. Clark*, 541 F.2d 1016, 1018 (4th Cir. 1976) (unproven allegations may be stricken from indictment at trial); *see generally United States v. Hughes*, 766 F.2d 875, 879 (5th Cir. 1985) (court may withdraw surplusage from jury consideration). Because the allegations of possession of the Cabinet Firearms were unproven, withdrawal from the jury's consideration would have been appropriate even if Count Five did not charge separate offenses.

closet where firearm was found).

In this case, the government argued that the presence in a cabinet in a common area of Robinson's residence is sufficient to infer knowledge. This Court disagrees. The presence of an item in the common area of a joint residence will support an inference of knowledge if that item is in plain view. *See United States v. Fields*, 72 F.3d 1200, 1212 (5th Cir. 1996) ("[T]he fact that the shotgun was found in plain view, leaning against a wall, is sufficient to establish that he had knowledge of and access to the shotgun."). When the item is found in a common area of a jointly occupied residence but outside plain view, "other circumstantial indicia" of knowledge is required. *United States v. Mergerson*, 4 F.3d 337, 349 (5th Cir. 1993) (constructive possession not established where firearm was hidden in shared bedroom).

Here, there was no dispute that the ammunition, which was in a cabinet in the laundry room, was not in plain view. Nevertheless, the government argued that knowledge may be inferred because the ammunition matched the 16-gauge shotgun of which Robinson indisputably had knowledge. Under certain circumstances, the possession of a firearm may justify an inference of knowledge of matching ammunition found in a location over which the defendant had dominion and control,[10] and vice versa.[11] However, this Court has found no case where a court found knowledge based on a single match alone. To the contrary, courts have considered a match to be one of *other* indicia of knowledge. *See, e.g.*, *United States v. Prudhome*, 13 F.3d 147, 149 (5th Cir. 1994) (knowledge of firearm inferred where firearm was located in car defendant was driving, firearm was located beneath defendant's seat, and defendant was in possession of ammunition

---

[10] *United States v. Chapdelaine*, 989 F.2d 28, 23 (1st Cir. 1993).

[11] *United States v. Prudhome*, 13 F.3d 147, 149 (5th Cir. 1994) ("A reasonable jury was entitled to … infer knowing possession [of the firearm] from the facts that Prudhome was driving, the gun was located directly under his seat, and he had three rounds of matching ammunition in his waist pouch.").

matching firearm); *United States v. Perez*, 653 F. App'x 493–94 (9th Cir. 2016) (knowledge of firearm inferred when ammunition found on defendant matched firearm *and* "some of the ammunition in [the] pocket had the same manufacturer markings as the cartridge loaded in the weapon"). Such an inference of knowledge, which necessarily depends on an assumption that the firearm is in use *by the defendant* (why else would ammunition be kept) would be particularly inappropriate here where the firearm, which was indisputably in poor firing condition,[12] was both unloaded and on display resting on nails in the wall above the hall door, and where the ammunition was located in a common area of a jointly-occupied dwelling. Accordingly, there was insufficient indicia to justify an inference of knowledge. Acquittal on Count Six was, therefore, warranted.[13]

## V
## Conclusion

In accordance with the Court's oral ruling, Robinson's oral Rule 29 motion is **GRANTED in Part and DENIED in Part**. The motion is GRANTED on Count Six and with respect to the allegations related to the Cabinet Firearms in Count Five. The motion is DENIED in all other respects.

**SO ORDERED**, this 27th day of December, 2019.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**

---

[12] The weapon was rusted, taped, and, according to Reichert, missing a trigger guard.

[13] Because the ammunition was found in the unlocked section of a cabinet in a common area, it is properly deemed an integral part of Robinson's dwelling, so as to have required a simultaneous possession charge with the firearms. *McCrary*, 643 F.2d at 328. Accordingly, had Robinson been convicted under Count Six, his conviction under Count Five would have resulted in dismissal of the ammunition charge. *See Meza*, 701 F.3d at 432 (in cases of simultaneous possession, "the government may charge and try a defendant for multiple offenses, but there may not be simultaneous convictions and sentences for should the jury return guilty verdicts for each count, … the district judge should enter judgment on only one of the statutory offenses").